IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 3, 2015

## PRESTON RUCKER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-00671      James C. Beasley, Jr., Judge**

_____

**No. W2014-01573-CCA-R3-PC  -  Filed June 25, 2015**

_____

The petitioner, Preston Rucker, seeking post-conviction relief, argued that trial/appellate counsel was ineffective because he failed to call a certain witness to contradict the victim's testimony and failed to request a jury instruction regarding the kidnapping charge against the petitioner. Following an evidentiary hearing, the post-conviction court concluded that the petitioner failed to show that counsel was ineffective. We have carefully reviewed the matter and affirm the order denying relief to the petitioner.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Jake R. Hayes, Memphis, Tennessee, for the Appellant, Preston Rucker.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Joshua Corman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS**

The evidence resulting in the petitioner's convictions for especially aggravated kidnapping and especially aggravated robbery and sentences, respectively, of twenty years and twenty-four years, to be served concurrently, were set out by this court affirming the convictions:

The victim, Keir Moore, testified that the [petitioner] kidnapped

him, forcing him to drive his truck from a convenience store parking lot to an apartment in Memphis, where he said he was robbed and shot by the [petitioner] and two companions.

The victim testified that he had lived in Meridian, Mississippi, for twenty-five years and was a truck driver for Swift Transportation. Prior to that, he had been a combat medic in the United States Army, a sales representative for Sisco Food Services, and a corporate sales manager for AT&T.

The victim said that on July 30, 2007, he came to Memphis to deliver a load at the Georgia Pacific warehouse and pick up scrap metal at an aluminum plant. After he picked up the load of scrap metal, he parked his trailer at the Swift terminal on Brooks Road and went to a restaurant across from the home of Elvis Presley. Finishing lunch, he began driving to the Swift terminal, which he believed to be about two miles away. On the way, he became lost and pulled into the parking lot of a convenience store to ask a man in the parking lot for directions. He said that the man, whom he identified as the [petitioner], "ran around to the other side of the truck and jumped in the truck." He told the [petitioner] that no one was allowed in the truck, and the [petitioner] replied that he was going in the same direction as the victim and would show the victim where he wanted to go. After being told again that he was not allowed in the truck, the [petitioner] produced a pistol, pointed it at the victim, and said, "Shut up mother fucker and drive."

The victim told the [petitioner] that he had just gotten out of the Army and had a five-year-old son and that the [petitioner] could take the truck and everything else that the victim had. The [petitioner] responded with the same command, and the victim began driving. The victim explained why he could not recall what direction they took from the convenience store lot: "I tell you what, after that happened, all I can remember is like tunnel vision. I was just scared to death, I was shaking. I really can't remember anything besides just driving down the road, just being scared to death."

The victim said that the [petitioner] directed him to an apartment complex and that "it looked like he was scoping out the area. He was looking out the front and looking in the rear-view mirrors." The victim said that he "begg[ed] for [his] life." He testified that the [petitioner] made a telephone call and "basically said, I'm coming, I'm on my way." The

2

[petitioner] told the victim to open the driver's side door, grabbed the back of the victim's shirt, and pushed him out of the truck. The victim said that the [petitioner] pushed and pulled him and said "keep walking." They stopped at a door to one of the apartments, and the [petitioner] told the victim to knock on the door. The victim described what happened next:

> A. I was pushed inside the apartment and when I got in, somebody came out of a broom closet to my left with a red bandana over their face and another weapon.
>
> Q. So at this point when you were walking in the apartment, how many individuals were there?
>
> A. Three.

The victim said that "the guy [who] jumped out of the broom closet with a gun, put it to my head, he pushed me and he pistol whipped me on the head." He was told to "lay down and stare at the floor." The [petitioner] still was present. The three stripped the victim, except for his underwear and t-shirt, and "kept asking . . . where more money was." They went through his pockets and took $60. The victim asked the three assailants not to hurt him:

> I was on the floor and I kept begging them, please not to hurt me. I kept telling them I have a five year old child at home and I was basically just calling, saying, "In the name of Jesus, please, please don't shoot me, please don't kill me, you can have everything I have, I just want to get home to see my child again."

The three men "kept telling [the victim] to shut up. They would kick [him] in the ribs and pistol whip [him] in the head with a pistol." He said that, at this point, "[b]lood was running into [his] eyes and all over [his] face." The victim said that he believed the [petitioner] had his knee on the victim's back, but he did not look up because he was told he would be killed if he did. He said that the three men had two guns between them, and they were "passing" them around. After one of the men left the apartment to search the victim's truck and then returned, the victim got up and ran toward the door, attempting to escape:

> I ran and grabbed the door and tried to turn the handle,

3

but the door was locked.  And by the time I turned the switch, the lever, or whatever you call it to get out of the apartment, somebody came behind me and grabbed me and then the other two came and pulled me back.

The victim then tried to take a pistol from the assailant who had opened the door, was grabbed by the other two, and then tried to run at the man with the pistol again.  The victim was shot in the stomach and "went outside . . . screaming for help," as the three men ran off.  He described how he performed first-aid on himself:

Well, I took my shirt off, I was a medic, so I kind of knew somewhat, what to do.  I took my shirt off, ripped it in half.  I stuffed both pieces of cloth in the exit and entry wounds as far as I could.  And then I got up in a ball and brought my knees to my chest to try to constrict the flow of blood, to slow down the flow, so I wouldn't bleed to death.

The victim said that a man came out of one of the apartments and "held [a] towel to [his] back and screamed at someone to call an ambulance."  He passed out in the ambulance on the way to the hospital, where, ultimately, he had eight surgeries and remained two and one-half months.  The victim described his surgeries:

Q.      When was the last surgery done?

A.      About three months ago, it was stomach wall reconstruction surgery.  My organs had fallen down.  I had a hiatal hernia, which was a gigantic hole in my stomach and all my organs had come loose and they had fallen down and were laying on top of each other and they had to go in and sew all my organs back up.

They removed all . . . my muscles in this area here were taken out.  And they opened me up like a fish, basically, sewed everything back up and then took a strap of muscle from somewhere else in my body and placed it over my stomach.

Q.      How many organs did the bullet strike?

A.    It went through my lungs, my liver, my gall bladder, my diaphragm and both my large and small intestines.

The victim said that, while in the hospital, he was shown a photospread and identified the [petitioner] as one of his assailants.

Officer Myron Grafenreed of the Memphis Police Department testified that on July 30, 2007, he and his partner were at the Cambridge Apartments responding to another call when several residents approached them and said that someone had been shot at the front of the complex. As he and his partner arrived at the scene, they saw the victim "on his knees, kind of doubled over," and he told them he had been shot.

Officer Thomas J. Ellis testified that he was a crime scene investigator with the Memphis Police Department and was called to the scene where the victim had been shot. He said that the victim's tractor-trailer was processed for fingerprints. Officer Ellis explained how the condition of the vehicle affected whether fingerprints might be located:

Depending on the vehicle, how clean it is, weather conditions, for example, the vehicle if it's very dirty then we're not going to get any prints of value. You may get a smudge, or where it appeared that the person was wearing gloves, but there wouldn't be any ridge detail in the prints to obtain a print of value.

Officer Ellis testified that he did not think there were any prints of value on the vehicle. On cross-examination, affirming that no fingerprints had been found in or on the truck, he detailed what surfaces had been processed:

Front left side on the exterior and the front left side, the front, the left front door, front right side, right front door and the interior is going to be the driver's side, the rear driver's side and the passenger side and the rear passenger side and the middle console and the glove box.

Sergeant Kathleen Lanier of the Memphis Police Department testified that, through the Crime Stoppers program, a tip regarding the shooting and robbery of the victim had been received:

5

I was given a name, what we call a moniker, a nickname and after getting the information from the tipster I went into the Memphis Police Department data[]base and was able to, through some previous reports and arrests, come up with the name of a possible suspect and the name of a person who was in the system, that fit the description, that fit the information that I got from the tipster, as far as the physical description and all[.]

As the result of this information, Sergeant Lanier prepared a photospread from which the victim identified the [petitioner]. She said that officers put out a broadcast for the [petitioner] and were told that private security guards at the Cambridge Apartments had seen him there following the broadcast. At the complex, the [petitioner] was chased and detained by private security officers.

Testifying as the only witness for the defense, the [petitioner] said that between 2:00 and 3:00 p.m. on July 30, 2007, he was at a market across from the apartments where he lived when the victim, who was driving a truck, waved and "ma[de] gestures . . . like, come here." The [petitioner] said that he kept walking and was waiting to cross the street when the victim came up behind him, asking, "[D]id I know where he could score?" At first, the [petitioner] gave a negative response to the victim. However, he then told the victim to drive his truck to the apartment complex. After the victim parked his truck, the [petitioner] took him to an apartment, "knocked on the door and a gentleman came to the door and [the [petitioner] was like, 'Hey, he's trying to get something.'" The [petitioner] denied going into the apartment or beating, robbing, or shooting the victim.

Following this testimony, the defense rested.

State v. Preston Rucker, No. W2009-01650-CCA-R3-CD, 2010 WL 1172075, at *1-4 (Tenn. Crim. App. Mar. 29, 2010).

At the evidentiary hearing, the petitioner testified that the same attorney represented him at both the trial and in his direct appeal. He said that counsel had spoken with him a total of less than two hours prior to the trial. In the discovery provided by the State was information that a witness had seen the victim with a person named "Fats" and gave his address. The petitioner said he had never been known by that nickname. Counsel told the petitioner that he had talked with this witness, and "she didn't want to have nothing to do with it." The petitioner also said that, according to the information

6

provided to him regarding the police investigation, a "James Milton," employed by Comcast, had seen two suspicious-looking teenage African-American males in the area.

The attorney who represented the petitioner both at trial and on direct appeal testified that he had been practicing criminal law for thirty years. He said he met with the petitioner "several times" before the trial. Their version of events was that he and the victim went in the victim's truck, and the victim then voluntarily went alone into the petitioner's apartment. At trial, counsel questioned the victim about parts of his story that did not make sense, such as whether the truck's doors had been locked and how, driving such a short distance, he had managed to get lost. Basically, the case consisted of conflicting accounts by the victim and the petitioner. As for the witness called "Fats," counsel told the petitioner it was unlikely this person would "come in and say we robbed [the victim] when they got you for it." Counsel did not remember whether he attempted to contact the Comcast worker, but reviewing the discovery packet, he said that his testimony would not have been "that contradictory" to the victim's version. Regarding a connection between the robbery and the kidnapping, counsel said his focus was on the petitioner's claim that the crimes had not occurred at all. In his investigation prior to trial, counsel talked with another resident at the apartment building and to the store clerk, but neither could provide information helpful to the petitioner.

The testimony of the petitioner's trial/appellate counsel concluded the evidentiary hearing.

## ANALYSIS

We will review the petitioner's complaints that counsel, who represented him at both the trial and on direct appeal, was ineffective.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

7

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687(1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

Following the evidentiary hearing conducted in the present appeal, the post-conviction court made oral findings of fact and conclusions of law which, later, were

8

incorporated into the court's written order denying relief.  The court concluded that the petitioner had failed to show that he was entitled to relief:

First of all with regard to the issue of the kidnapping and the robbery and the double jeopardy violation under the argument of State v. White, I think in this particular case the testimony at the trial from the victim was that the [petitioner] got in his truck and at gunpoint forced him to drive a distance.  And in reviewing the testimony, it wasn't like, you know, across the street.  There was some distance involved.  He was forced at gunpoint to drive to an apartment complex, forced at gunpoint out of the truck, forced at gunpoint into an apartment where he was forcefully beaten and subsequently shot and robbed.  His truck was robbed.  That was the testimony from the victim.

And there was an analysis by the [a]ppell[ate] [c]ourts with regard to the charge of kidnapping and the sufficiency of the evidence testimony or review of the opinion dealing with those specific facts as it relates to the kidnapping charge.  And I think, you know, under the White decision where you have something that's incidental to an aggravated robbery the question becomes . . . [is it] a part and parcel to the robbery?  Well, in this case even though the White opinion hadn't come out and the instructions that we're now required to give in a kidnapping type case, the proof in this case was that the kidnapping was not incidental to the robbery.  It was a completely separate thing. . . .  [A]ccording to the victim [he] was forced at gunpoint in his truck to drive to another location.  Forced at gunpoint to get out of his truck.  Forced at gunpoint to go inside an apartment room or apartment and then o[]nce he got inside, he was accosted.  They asked for money.

They held him while one of the defendants went out to his truck to retrieve money.  They came back in.  They asked for more money.  The victim got up and tried to run.  Was stopped because the door was locked if I remember correctly, and then he was shot.  And I think the proof in the case was the victim's testimony, and that's what I'm referring to[], was very strong and very[] significant in that the facts that would allege a kidnapping where his liberty and his ability to move about was restrained.  And it was done at gunpoint and he was forced to go places where he did not want to go at gunpoint.  I think it's a completely separate crime from the robbery that occurred after he got inside the apartment complex, inside the apartment.  So I don't think that there's any double jeopardy issues.  I think it was two completely separate offenses.  And I don't think even

9

under the analysis of the White opinion and the cases that have come about as a result of that, the facts of this case would not warrant an argument that these were not two separate crimes. I'm comfortable that there was complete proof of two separate crimes. That it was not incidental to the robbery. So I don't have any problem with that.

The issues with regard to the sentence, . . . the Court is of the opinion that the nature of the crime in this case, the victim's testimony, and I'll address the sufficiency of the evidence and the argument and the defense put on by [trial/appellate counsel] in a moment. But just for the purposes of sentencing, the testimony in this case and the basis for the conviction was the victim's testimony who said that he was accosted by the [petitioner], forced to go to this other location, forced at gunpoint, threatened at gunpoint, pistol whipped, subsequently shot, spent two to three months in [the hospital,] had seven or eight surgeries, had to have his stomach and other parts of his body reconstructed as a result, had permanent injuries, permanent damage, were very aggravated.

This was according to the victim clearly a robbery and he suffered serious bodily injury. It was very aggravated per the facts. And the [petitioner] apparently was a Range I Offender. This court would not have found that he was a mitigated offender for no other reason other than he had a prior record and beyond that . . . the facts and circumstances of the case were very aggravated. . . . I mean the injuries inflicted were very serious. . . . I believe that the law had already changed at that point with regard to the stating point. But I believe the Court considered all the factors included in this case and felt that the more serious offense was obviously the robbery because in the course of that I think is when he was shot.

And the punishment I feel imposed was within the range of punishment was proper. I think I ran those two concurrent. But I'm comfortable that [trial/appellate counsel's] argument was consistent with what his defense had been all along. And I don't find that there was anything wrong with the ruling that we had and the basis for the punishment imposed, that it was improper because I don't think based on everything that I've seen – and let me double check. [The petitioner] was not a mitigated offender. . . .

. . . .

10

There were several other factors that I know the Court considered. But I'm trying to remember. I know that he was not, I don't believe, a mitigated offender under the law. However, I can't find what his record was. But, . . ., I'm satisfied that he was not. And so I don't think that there was anything improper in the sentence and that [trial/appellate counsel's] failure to raise that issue on appeal was not improper.

Now, with regard to the ineffective assistance of counsel, . . . to be quite honest with you, I remember this case and the issues as [trial/appellate counsel] stated and as [the petitioner] stated were very pretty much cut and dry. There was not [a] whole lot of issues. [The petitioner] admitted – identity wasn't the – the victim picked out a photograph of [the petitioner] whose name had been provided anonymously to the police department. But as a result of his name being provided, they prepared a photo spread, the victim identified [the petitioner]. [The petitioner] admitted that he was the person that was with the victim. That he was the person that directed the victim over to the apartment, in [the petitioner's] testimony that he took him over to the apartment, directed him over there, walked or however [the petitioner] got there, but he admitted that that was him. He admitted that he took him up to the door of the apartment complex and got him inside. And then he denied that he did anything else [or] was involved in anything else.

So identity wasn't an issue. It was strictly a fact of the victim said he jumped in my truck armed with a gun. And the [petitioner] said that was me that told him where to go and where to get the drugs but I didn't have anything to do with any robbery or any kidnapping. But identity wasn't an issue. So the issue was strictly credibility. The issue was strictly, you know, there was no question he had been shot. There was simply a question of whether or not this was a drug deal that went bad or whether or not this was a robbery. And [the petitioner] said it was a drug deal that went bad and the victim said it was a robbery[,] and the victim suffered serious bodily injury. And the jury heard all of the issues that we've talked about today. The jury heard everything. They heard [the petitioner]. They heard the victim cross-examined about was it in fact a drug deal. They heard [the petitioner] take the stand and say that's what it was. And the jury weighed the facts and ruled in favor of the victim. I can't think of anything else that [trial/appellate counsel] could have put on to support [the petitioner's] argument that this was a drug deal that went bad and that he didn't have anything to do with it short of the two people that were inside the apartment when the victim went inside and any witnesses that for argument's sake, if there had been witnesses that had s[een] [the petitioner] who admitted that

11

he walked the victim up to the door of the apartment complex. If those witnesses had said, yeah, I saw [the petitioner] walk him up to the door of the apartment complex, . . . that doesn't give us any proof other than what we already have.

And I think that the testimony of witnesses that said they saw people approaching the truck, well, we know one or two of the robbers went out to the truck based on the trial testimony of the victim. And, you know, a known drug dealer was seen in the accompaniment of somebody else walking in the complex. Well, we know it was a drug house. [The petitioner] said that. Everybody in the complex knew that's where you went to buy drugs. That's why I took the victim over there. And so I don't know that any of these witnesses that are discussed if they had said anything would say anything any different than what the jury heard in this case. This was strictly a – if you want to call it a he said, she said. I mean, we don' have a she in this case. But I mean, it's a credibility. . . . [T]he victim said this is what happened to me. The [petitioner] said it was a drug deal that went bad.

You know, I remember the victim's testimony had . . . some very questionable issues to be resolved and obviously the jury resolved them in his favor. I felt that [trial/appellate counsel] cross-examined and raised those issues and raised the fact that the victim's story had some hard to believe statements in it, had some hard to believe credibility issues in it. You know, how do you let a man jump in your truck? How do you, you know, he's talking to him in the first place. There was testimony about the location. . . . [T]here was some things that the victim said that I remember him being cross-examined about where I could have just as easily understood if the jury had accepted that this was a drug deal.

I could have understood if the jury found that based upon all the proof that was presented. That they very easily could have found that. But they also very easily could have found that even if it was a drug deal, even if the victim was looking for drugs, even if the victim did go to this complex with [the petitioner] to buy drugs, in the course of that he was beaten, he was robbed and he was shot. And the victim testified that [the petitioner] was involved in this. Was inside the apartment when all these things happened to him. He denied that. So it was strictly a credibility issue. But there was no question but that the victim was seriously hurt and robbed.

12

And so I think even if you take in the light favorable to [the petitioner] that this was a drug deal that he was escorting the victim over there, in the course of that the victim was robbed and seriously injured. And I think – I don't know of any proof that could have been introduced other than what was introduced. And I think it was strictly a credibility issue, but I think the jury could look at the injuries that were inflicted and return a verdict that they did.

And I don't know of anything [trial/appellate counsel] could have done that could of put on a better defense for [the petitioner]. It was what it was. And, . . . I think he put forth what his defense was and I can't imagine anything that [trial/appellate counsel] could have said or done any different.

So [for] all those reasons[,] I'm satisfied that [the petitioner] received adequate counsel; that [trial/appellate counsel] did a proper job in representing [the petitioner]; that he did provide effective assistance during the course of this trial; that he presented the basic[ally] only defense that he could present under the facts that were presented to him; that [the petitioner] had his day in court and received a fair trial. And [trial/appellate counsel] put all of those issues before [the] jury and the jury ruled against him. So I am – and in regard to the sentencing, I think this Court followed the law and did not find and I still would not find that [the petitioner] was a mitigated offender. And under the facts and circumstances, I think the sentence that was imposed was a proper sentence.

The record on appeal shows that the post-conviction court correctly analyzed the proof in this matter. The jury had to choose between the version of the victim and that of the petitioner as to how the victim came to be shot and robbed. Obviously, the jury believed the victim and not the petitioner. Further, by accepting the victim's version of the incident, the jurors likewise concluded that the robbery and kidnapping were separate offenses. There is no basis for us to conclude that, had trial/appellate counsel done all the petitioner argues he should have, the outcome of the trial would have been different. Accordingly, we agree with the post-conviction court's conclusions that the petitioner failed to prove either that counsel was ineffective or that the petitioner was prejudiced thereby.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the denial of post-conviction relief.

13

_____
ALAN E. GLENN, JUDGE